Kenomi Jones, Certified Law Student You can proceed. Great, thank you. Good morning, Your Honors. May it please the Court. My name is Kenomi Jones, Certified Law Student, representing Plaintiff Alan Troy Nimer, supervised by Attorney Michael Seplow through the University of California, Irvine Appellate Litigation Clinic. I will be making the equal protection argument, and I am joined by my co-counsel, Mark Green, who will be making the heck argument. Your Honors, before I begin, may I reserve two minutes for rebuttal? Please watch the clock. Thank you. Mr. Nimer respectfully requests that this Court set aside the Arizona District Court's order granting summary judgment to the defendants. For Mr. Nimer's Section 1983 equal protection claim, the District Court erred in granting summary judgment for two reasons. First, the District Court made a factual finding that the racial slur was not enough to infer that Mr. Nimer was denied adequate medical care due to his race. And second, the District Court improperly weighed the evidence and made a factual conclusion about the defendant's proffered justification to lead Mr. Nimer without pointing to any evidence in the record to support that assertion. To my first point, the District Court first conceded that the racial slur created a genuine dispute regarding racial animus, but then went on to say that while the racial slur was ill-advised, incredibly offensive, and highly unprofessional, that using the racial slur was a stray remark not enough to infer intentional discrimination. Let me turn you just to another point. What was the evidence that raised a genuine issue material fact that defendants gave Nimer inadequate medical care? Your Honor, so within 20 seconds of the audio encounter, Mr. Nimer has testified that the defendants called him a nigger, which is not a stray remark under the law. I want to hear about the inadequate medical care. What's the evidence of that? The evidence of that, Your Honor, is that the defendants were engaging in aggressive and hostile behavior. They were cursing at him. They were disregarding his concerns. And at this point, on summary judgment, in terms of standard of care, which the District Court did not address that issue, Mr. Nimer is entitled to a jury to determine that. So there was no evidence submitted on summary judgment? There was no evidence in terms of standard of care, Your Honor. Of inadequate medical care? Your Honor, Mr. Nimer alleges that prior to the acts that delved into the violence, the defendants' aggression in terms of their cursing, their hostile treatment towards Mr. Nimer, their repeated asking of questions, that all is circumstantial evidence in conjunction with the direct evidence of discrimination that led to inadequate medical care. And because this Court has recognized that the racial slur is indicative of racial hatred and bigotry, along with the defendants' treatment, that on summary judgment is enough to create a genuine dispute of facts that mandates remand. Ms. Jones, would you make particular what was wrong with the medical treatment which the defendants gave the plaintiffs? Your Honor, from Mr. Nimer's perspective, the defendants and their hostility, the defendants are experienced emergency professionals who testified to being able to navigate people who are impacted with drugs and use profanity or display uncooperative behavior. But the record reflects that when they showed up, they were cursing at Mr. Nimer. They were not... Is this a claim for mental distress because of the cursing? Or is it a claim that the medical treatment was inadequate and therefore violated his civil rights? Would you please distinguish those two? Yes, Your Honor. It is a claim that the medical treatment was inadequate. How was it inadequate? Because the defendants acted in intentional discriminatory ways that denied... What about the medical treatment was objectively below the standard of care? That, objectively, Your Honor, that is part of what Mr. Nimer argues that a jury should be able to decide. There is no... My question to you is a fact. Were they slow? Were they clumsy? Were they hostile in hitting him? What was wrong about the medical care, leaving aside the slurs? Yes, Your Honor. They were hostile. They were slow. This all delved into violence under which my co-consult will speak about regarding the Heck argument, and I'm going to pass it along to him for time. All right. Thank you. Thank you, Your Honors. Mark Green, appearing on behalf of Alan Troy Nimer. Mr. Nimer, for the request that this court set aside the Arizona District Court's order granting summary judgment to defendants based on the lower courts' misapplication of the Heck doctrine, the District Court's conclusion that Mr. Nimer's civil claim for excessive force necessarily implies the invalidity of his criminal conviction is incorrect because plaintiff's claim that defendants retaliated against him while he was on the ground does not conflict at all with the idea that he assaulted them, as was proven in court by the jury prior to that moment,  and this is borne out both by plaintiff's testimony and the testimony of third-party independent witness Perry Allen, who testified at trial once he was on the ground, and defendants, as both testimonies bear out, began hitting him. That behavior is not covered by the conviction, and this is only further bolstering... So you relied in the... You relied, I believe, solely on California law. How do we know that Arizona law is the same? Indeed, Your Honor. Oh, much of the jurisprudence surrounding Heck has come from the California resisting arrest statute. There is not particular precedent regarding this Arizona aggravated assault statute, and yet if we look to the jury instructions as the court instructs us in Lemos, we can see that the jury found only that Mr. Nimer committed an assault while he knew that the firefighters were in the course of their official duties, and so at the conclusion of that assault, the firefighters' duties... The jury was not instructed as to whether the firefighters were in their duties once he's on the ground, and the assault has been concluded. Furthermore, the jury was not instructed as to the scope of the firefighters' duties, nor were they instructed that they have to reject the testimony wholesale of the independent witnesses, and so they could very well have believed Perry Allen's account that as he rounded the corner, he saw the defendant firefighters beating Mr. Nimer while also accepting that Mr. Nimer did indeed clutch one defendant and swing at another. What's your best case that you're relying upon? I would say... The District Court of Rome. Excuse me, Your Honor. I would say that Hooper v. County of San Diego provides the strongest basis for the District Court's order to be overturned. In Hooper, a woman who was convicted of resisting arrest for pulling her arm away at the moment the police were putting her under arrest was at the same time bitten by a dog, and so the court in Hooper said that even though there was not a bright temporal separation between these two events, the court would still analyze these two events separately since they pertained to a factual context without a continuous interaction. If under Arizona law, a conviction of excessive force covers the entire course of events from beginning to end, which is not the case for California law, then we would have to find that the District Court was right. Isn't that correct, or do you think there's some other principle involved? I think that there is a basis to conclude that there can be, that these events can be separated out, and ultimately the question of... Isn't that a question of Arizona law? It may indeed be a question of Arizona law, but the District Court did not rule specifically on that point. They only said that because there was not a significant temporal separation that Mr. Hammer's conviction necessarily invalidates his civil claim, or rather that his civil claim would invalidate his conviction, and so he should be allowed to present evidence as to the reasonability of force, the scope of the duties, and have his day in court without this procedural bar knocking down his case. And Your Honors, I will reserve the rest of my time for rebuttal. Thank you very much. Good morning, Your Honors. May it please the Court, Garrett Griggs on behalf of Defendants Appellees. Your Honor, I'll respond to the arguments in the order they were presented to you today rather than the order that the District Court addressed them. Your Honor, there are two nevers in this case. It would have never been okay for Defendant Appellees to use the N-word of racial slur during the course of their official duties, and there was never any evidence that they did. Why can I say that there was never any evidence that they did? Because on this record and in front of the jury, considered by the criminal jury, was an audio recording. Now, the entirety of the audio recording was over two hours long, but we can break that down between on scene, before the officers arrived, during the time the officers were present, and then at the hospital. On scene... It's a declaration by plaintiffs that that word was spoken. I mean, that's evidence for purposes of summary judgment. Your Honor, when the record clearly shows that that is not the case, then the naked assertion by the plaintiff should not be considered by this Court. Your Honor, the record shows that the audio recording, the first two minutes and 45 seconds, which is the initial encounter, depicts the entirety of the violence that occurred and would have encapsulated any use of a racial slur. And there is no racial slur that was used. And we know that because you can listen to the recording and the transcript can be read. The only time that the transcript says that a racial slur was used is after the transcript was created and the plaintiff repeated it. He placed in his, again, naked assertions and wrote in the racial slur himself, even though it's not heard by any listener. Your Honor, we can even further narrow down the audio recording to 20 sections. This is a case where the appellate court should take the audio report and find that evidence given at the summary judgment should not be considered, like in the case of the Supreme Court where the audio report of the traffic stop occurred. Which case? That Supreme Court case, Your Honor? No, that's the Supreme Court case. The Supreme Court case? Are we referring to Scotty Harris or the more recent Salim case? You're saying that we shouldn't consider the sworn testimony of the plaintiff that the slur was given because the audio shows that it wasn't given. Is that your point? That is my point, Your Honor. Thank you. So are we allowed to do that as an appellate court, disregard evidence that was before the trial court? Your Honor, that's a matter I would like to follow up on. I have 28-day letters. Your Honor? Does that make a difference in this case, though? How does it make a difference? Yes, Your Honor, it would make a difference. It would make a difference because you would see that the record reflects that there was no racial slur used. And why is that impactful to this court? The only basis, excuse me, while there were several bases argued today, the only basis by the plaintiff for discriminatory animus was the use of the racial slur. Your Honor, furthermore, towards a discriminatory purpose, to your questions before, what evidence is there of inadequate medical care? There is no evidence of inadequate medical care in the record or the protocols used by the Phoenix Fire Department. And those protocols, we learn how firefighters and medical professionals with the Phoenix Fire Department respond to different situations, including combative and violent patients. We also learn what their care evaluation and treatment protocols are. And what the firefighters do and these EMS professionals do is they go on scene and they find out what's going on. And that's what they did here. What the record shows is not that the firefighters, the defendant appellees, began cursing and delaying immediately. What the record shows is that when the fire engine pulled up to the location of Mr. Nimer, Mr. Nimer began yelling immediately at the defendant appellees. What the record then shows is that it was Plaintiff Mr. Nimer who began cursing at defendant appellees. Your Honor, the protocols on the record show that what was being followed by the firefighters is what is in the protocol. How to address combative patients, someone who may be flailing, someone who may be not fully conscious, someone who may not be responding. And that's exactly what these defendants and these firefighters were facing. A person who needed medical care who was not responding to their attempts to treat, but they continued attempting. That is how we know that Mr. Nimer did not receive inadequate medical care. They continued to find out what was wrong, what drugs may be affecting his behavior, and what drugs may be affecting his body. And furthermore, after the violence, which I'm going to get to next, occurred, we find that the officers arrived on body camera. In the record, we have photographs and video that Mr. Nimer is laying on the ground in a prone position, just as any patient may be in that situation, with an EKG lead attached to his body being evaluated, his heart condition being evaluated. He had been given an IV. He had been given pain medication, and his vitals were being taken. He was receiving all the medical care that would be expected. So the firefighters met the standard of care in this situation. And Mr. Nimer, yes, Your Honor? What was the plaintiff here, or defendant at that time, I guess, what was he charged with? I don't have your result, Your Honor. Did that go to trial, or did they just plead guilty to it? It went to trial. It was a criminal trial in state court. And I'll move directly to that in just a moment. But we find out that all the evidence shows that the defendant, at least, did provide Mr. Nimer adequate medical care. And combined with no racial slur, there can be no discriminatory purpose shown. There is no evidence of it. And therefore, Mr. Nimer would not be able to succeed if this were remanded, and therefore should not be. Your Honor, getting to your point, what was the defendant, excuse me, what was Mr. Nimer convicted of, and how was he so convicted, and what impact does that have on this case? Your Honor, Mr. Nimer's claims, plaintiff's claims in this case, should be heck barred. And they should be so barred because the situation that you have in front of you is completely different than the Hooper case. In the Hooper case, it wasn't simply that the plaintiff there reached out her arm and was bitten by a dog. There was a sequence of events, and those sequence of events were analyzed under California state law, which, as Your Honor's pointed out, is different than Mr. Nimer's case. In the Hooper case, there was a sequence of events that began from contact, and there was a resisting arrest, and then there was the officer in that case gained control. And while the officer was maintaining control, then a separate factual context occurred. A canine dog left the officer's vehicle and bit onto the plaintiff. That is not at all like what we have here. As I said at the very beginning, we have 20 seconds of this audio that depicts the entirety of the violence. And so what violence did occur? Well, in the complaint, the plaintiff says, defendant started the fight. I was there. I called for medical help. Defendants began swinging at me and punching at me. But that's not at all what was presented to the jury by all the witnesses, and that's not at all what the jury decided in their verdict. What the jury found was that Mr. Nimer had violated two counts of Arizona Revised Statutes 12, excuse me, 13, 1204. And to be found guilty of that, you have to have committed assault. So the brief by the plaintiff's repellents say Mr. Nimer swung at one officer or pushed one officer and swung at another. But then there's evidence in the record that after that, which would be enough to be an assault against the officers. But then after that, there's evidence in the record, both from Mr. Nimer and from a third party, that he was down on the ground and being punched by one of the firefighters. So why isn't that more like all of our cases, Hooper and Leibovitz, and there's a whole bunch of them where you say if something happened, even if it's a continuous sequence, if something happens later and isn't the exact same act, that was the basis of the assault claim, that's not HECBARG. Thank you, Your Honor. The HECBARGs that apply, if they're even within a continuous series of events, there are different factual contexts. We do not have different factual contexts here. Yes, there was testimony that the defendants pummeled or punched or kicked the plaintiff while Mr. Nimer was on the ground. But that happened within 20 seconds, and there was no break between when the event happened. You said that it doesn't have to be a break. It can be a continuous sequence. Well, Your Honor, in Beets v. County, you mentioned that there were several. Well, this was the exact same act. That's what we said. She had the gun at the person coming towards me in the truck. And I'm offering that this is the exact same act. Mr. Nimer began swinging and pushing, and in the midst of gaining control, all of the other acts would have taken place. There was no punching and swinging and then a break, and then the punching and pummeling on the ground. It was Mr. Nimer began swinging and pushing, and to gain control of Mr. Nimer, the defendants restrained him. That is the exact same fact pattern. That is more like Beets v. County of Los Angeles. That is more like Mr. Griggs, the fact that the plaintiff here was convicted of assaulting the police officers doesn't mean the police officers didn't use excessive force in subduing him, does it? Your Honor, the firefighter is here, and it does mean that. Thank you for the question. Why? It means that because under Arizona state law, to have found guilty to receive the convictions that Mr. Nimer received, then the jury would have had to determine that the firefighters were acting in their official duties. And they were, because under the Yoshida case, you could be acting in your official duties even though you're acting unconstitutionally, correct? Your Honor, again, that's another situation. I would prefer to follow up by 20-8-8 on your thinking. It's another situation, of course. It's another case. But tell me, why is it not applicable here? I don't have—I'm not prepared to apply that case. Well, take a look at that. Yoshida, 9-86, Pacific 2nd, 216. It's a 1998 Arizona case, and the important issue is that assaulting police officers encompasses all aspects of an officer's good faith performance of his or her job-related duties, even if the officer's actions are later found to be constitutionally unreasonable. So they were acting in their official duties. Therefore, he could be convicted of assaulting them, even though they were assaulting him. Your Honor, thank you. I understand, and I can answer your question by also responding to a point made by counsel, where what the jury found and what the jury decided. Your Honor, the jury heard the testimony of multiple witnesses, including the firefighters. They heard Mr. Nymer's account where he said he was struck first and was taken to the ground and pummeled. They also heard the accounts where—but what they decided, what the verdict shows, is that because Mr. Nymer was found guilty of aggravated assault, two counts, then the entire sequence fits within that verdict. The firefighter's defense of themselves fits within that sequence, and so it is within official acts and is not excessive force when responding to force. So where Mr. Nymer was the provocateur in bringing the force and the firefighters and defendants were responding to the force to protect themselves and to protect their colleagues, that is not excessive force, and that is not outside of their official duties. Your Honor, the district court— You're well over time, so can you wrap up? Yes, the district court relied on the criminal jury for facts and made no factual determinations for themselves. The case should not be remanded. And if the court has no further questions, I submit on the briefs. Thank you. You have some time for rebuttal. Thank you, Your Honor. There are three pieces of evidence in the record. The deposition, the trial testimony, and Mr. Nymer's annotated transcript that reflect that the racial slur was used. And therefore, even at a minimum, Mr. Nymer is entitled to have a jury listen to the audio in order to determine the nature of that slur, which is, again, a genuine dispute, which on summary judgment is inappropriate. And further, Mr. Nymer did call 911 seeking treatment for breathing issues and chest pain. The defense contends that there was still adequate medical care given during that point. However, the defendants, they're telling Mr. Nymer to, quote, ride his high out. He's the one down there doing drugs, and it's his problem. They are acting slowly. They are not communicating with him. The defendants allege that they were feeling unsafe and, therefore, packed up and leave. However, it is inconceivable that five experienced medical professionals would not communicate that to someone who was in distress. At least three of them have 10 years of experience at the time of the encounter. So, Your Honors, with 2 minutes and 45 seconds, which is what the audio captures, them determining that everything is unsafe, which ultimately leads into the violence, is not sufficient on summary judgment to mandate medical care. Thank you. The case of Nymer v. Brock is submitted. We thank both sides for their argument, and thanks to the law school for taking on the case. Thank you.
judges: Siler, BEA, IKUTA